People of State of Illinois, Defendant in Error, v. Homer Hensley, Plaintiff in Error.

February term, 1945.
Released for publication April 5, 1945.

Heard in this court at the Opinion filed March 5, 1945.

Cyril C. Endicott, of Carmi, for plaintiff in error.

Albert McCallister, of Carmi, for defendant in error.

Mr. Presiding Justice Bristow delivered the opinion of the court.

The village of Norris City, situated in White county, Illinois, maintains two lakes from which it obtains its water supply. The lakes cover an area of approximately 30 acres and are located about one mile southeast of the city. Separating these two lakes is a gravel highway, and connecting them is a concrete drain running under this highway. These reservoirs are fed by a stream that flows from the north and empties into the north lake. The city's pumping station operates from the south lake.

The War Emergency Pipe Line, a corporation, maintains and operates a pipe line known as the "Big Inch" which pumps oil from Texas and Arkansas into the eastern states. The pipe line properties, consisting mainly of large oil receiving tanks, are situated on the southeasterly edge of the village of Norris City. Lying between these tanks and the lakes are the Illinois State Highway Route 1 and the right of way of the New York Central Railroad Company.

In order to conduct the oil through the pipe line, there are pumping plants which are located at intervals of approximately every 50 miles. These so-called booster stations exert a pressure of 650 pounds, and the pressure at the terminal is 50 pounds. At each of the receiving tanks, there are installed valves and relief valves to take care of an emergency. They are designed and tested to provide safety for the character of operation involved in this occurrence.

It appears from the testimony, without dispute, that on August 4, 1943 one of the valves broke, the relief valve not working, it permitted some 6,000 barrels of

oil to escape. Part of this oil found its way into the stream that ran into the north lake. But very little of the oil reached the south lake, and consequently the water supply of the village was affected but slightly. The north lake was almost completely covered with this escaped oil, which resulted in the destruction of many fish. The pipe line company employees removed the oil and fish without any cost to the village.

As a result of this occurrence, the plaintiff in error herein, Homer Hensley, was charged in an information filed in the county court of White county, with the violation of Ill. Rev. Stat. 1943, subpars. 2 and 3 of par. 466 of ch. 38 [Jones Ill. Stats. Ann. 37.415, subpars. 2, 3] which reads: "It is a public nuisance: (2) to throw or deposit any offal or offensive matter, or the carcass of any dead animal, in any watercourse, lake, pond, spring, well or common sewer, street or public highway; (3) to corrupt or render unwholesome or impure the water of any spring, river, stream, pond or lake, to the injury or prejudice of others." After entering his plea of "not guilty" to this charge, he was tried before a jury which found him guilty and assessed a fine of $100 and costs. In the course of this proceeding the plaintiff in error entered the usual motions for directed verdict, arrest of judgment and new trial, all of which were overruled and judgment entered on the verdict. The plaintiff in error comes to this court for redress. The record discloses the following undisputed factual situation in addition to the foregoing: Homer Hensley, at the time of the occurrence in question, was superintendent of the War Emergency Pipe Line Company, and in charge of the Norris City terminal. He was not present when the break occurred, but immediately upon being notified of it, directed the men under him to proceed with all dispatch to arrest the flow of the oil and repair all of the damages that were caused. So far as the record

reveals, Hensley had nothing to do with the purchase of the valves in question; had nothing to do with their inspection or installation, or that he was even on duty or in charge of the plant when the pipe line was constructed; nor that he had had any notice or warning that the valves were in a defective condition. The testimony further shows that these valves are always tested by the manufacturer before leaving the factory and that there is no practical way of testing them after installation. The evidence further indicates that the old valves were replaced with a better type and the prosecution makes the argument in their brief that this fact gives rise to the implication that criminal neglect must have been involved in this oversight. But nowhere does it appear that Hensley was charged with the duty of making any such exchange or that he knew of any superior type of valve.

There were four witnesses produced by the State. Not a one of these knew anything about the matter, except the presence of oil on the lakes, and that they were able to trace it to the broken pipe. They knew nothing that connected Hensley with the occurrence, except that he was superintendent of the pipe line company.

Counsel for plaintiff in error argue earnestly that the trial court was in error in not allowing their motion for a directed verdict at the close of the prosecutions case. Disposing of this contention favourably to the defendant, as we do, makes it unnecessary for us to consider other assigned errors.

The only case cited by either side passing upon the section of the statute involved in this proceeding is *Seacord v. People*, 121 Ill. 623. In this case the defendant was a railroad yardmaster and the owner and operator of a fertilizer plant. He had a contract with his railroad company wherein he acquired all of its dead animals which accumulated in the course of its

shipping operations. Frequently, Seacord would have more carcasses on his premises than his fertilizing plant could handle, and as a consequence they would be permitted to remain there too long. He was indicted under Ill. Rev. Stat. 1943, subpar. 1 of par. 466, ch. 38 [Jones Ill. Stats. Ann. 37.415, subpar. 1] which reads: "It is a public nuisance to cause or suffer the carcass of any animal, or any offal, filth or noisome substance, to be collected, deposited, or to remain in any place to the prejudice of others." Upon conviction, the defendant appealed to the Supreme Court. That court in affirming the conviction had the following to say: "It is immaterial whether the defendant intended the prejudicial result to others or not, if such result flows from his unlawful act of collecting and depositing the noisome substances. It is presumed that every sane man intends the natural and probable consequences of his acts."

 It is obvious that Seacord committed an overt act that could easily be adjudged unlawful by permitting dead animals to remain on his premises a considerable length of time. The inquiry follows: What unlawful act did Hensley commit that brings him within the purview of that decision? We think none. The unfortunate breakage of the valve in the pipe line and the consequent disgorging of 6,000 barrels of oil was solely the result of an accident. Throwing some light on the question involved here, there appears in the brief of the plaintiff in error the following citations: *Voss v. Chicago Sandoval Coal Co.*, 165 Ill. App. 565; *Barrett v. Mt. Greenwood Cemetery Ass'n*, 159 Ill. 385; *Thomas v. Ohio Coal Co.*, 199 Ill. App. 50. These cases all hold that under a state of facts quite similar to those involved in the instant case the corporation must respond in damages in a civil action, but in none of them does it appear that the superintendent of such corporation has been held jointly liable. Cer-

tainly, if there is no basis for civil liability against the plaintiff in error, there can not be any basis for criminal responsibility.

It appears that the plaintiff in error did make one grave mistake which probably accounted for the jury returning a guilty verdict, namely, on the 25th day of June 1943, one of the State's witnesses, Herman Dothager, an official of the Department of Health of Illinois, had a conversation with Hensley wherein Hensley was asked to put in some traps or a skimming plant which would prevent the escape of oil in the event of a breakage in the pipes, and Hensley's reply thereto was: "If we ruin the lake we will buy the damn thing and let the taxpayers build another one." Defendant does not deny that he made such a statement, but does testify that he discussed this proposed improvement with his company, and that it would cost $100,000, and that the company rejected the suggestion because of the enormous cost. The states attorney in his brief and argument addresses almost his entire attention to this statement made by the defendant, and argues most earnestly that because of such it brings him within the terms of the statute upon which this prosecution is predicated. We must concede that Hensley's reply to the inspector was most impertinent and discourteous, but we have not been persuaded that such is a basis for criminal action. We are of the opinion that the proof wholly fails to show any criminal conduct on the part of the plaintiff in error that makes him vulnerable to the charges contained in the information under consideration. The trial court should have directed a verdict for the plaintiff in error at the close of the State's case.

The judgment of the county court of White county is therefore reversed and the defendant discharged.

*Judgment reversed.*