# SUSSEX LAND & LIVE STOCK CO. v. MIDWEST REFINING CO.

# MIDWEST REFINING CO. v. SUSSEX LAND & LIVE STOCK CO.

(Circuit Court of Appeals, Eighth Circuit. December 5, 1923.)

Nos. 6192, 6193.

1. Courts ☞356—Statements of evidence in equity cases need not be allowed within judgment term.

Under equity rule 75, statements of evidence in equity cases need not follow the rule as to bills of exceptions in law cases, in that they must be allowed within the judgment term, or some extension during that term.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. Nuisance ⬬5—Use of land must be reasonable to escape liability for damage.

Where the use of land affects others, the use must be reasonable to escape liability for resultant damage to others, and what is reasonable depends on circumstances.

3. Waters and water courses ⬬67—Riparian owner entitled to damages for injuries by oil escaping into stream.

Owner of oil lands had no legal right to develop them without liability to landowner lower down stream for damage to grasses and pasture by escaping oil, though there was no negligence, and every known method and device to prevent loss of oil was used; the rule of damnum absque injuria not applying.

4. Waters and water courses ⬬67—Priority of right includes quality.

Under Const. Wyo. art. 8, § 1, and Comp. St. Wyo. 1920, § 833, a priority of right in water includes the quality as well as the quantity, and an oil producer has no right to deteriorate the quality of water in a stream as against persons lower down the stream having priority, though there is no negligence, and every known method and device is used to prevent loss of oil.

5. Waters and water courses ⬬75—Remedy for pollution limited to damages.

Where producer of oil in field, without negligence, and notwithstanding use of every known method and device for prevention of escape of oil, caused damage to persons on a stream having priority of right to the water, there being both deterioration in the water and damage to grasses, the injured landowner *held* not entitled to an injunction, but to damages.

6. Waters and water courses ⬬76—Measure of damages for injury to pasture land by oil held rental value.

Where pasture lands along creek were temporarily damaged by escape of oil from oil fields, preventing the proper pasturage of stock, the court did not err in applying rental value of the pasture lands as the measure of damages, in view of the lack of evidence which would support any other measure of damages, though landowner should be permitted to show the value of such pasture to him by reason of its usefulness and usability along with other lands for stock purposes.

7. Damages ⬬20—No recovery of possible damages.

A measure of damages should not be applied, which would permit recovery for possible, instead of probable, damages.

8. Waters and water courses ⬬76—Damages for injury to land by oil escaping into stream may be awarded, subject to modification.

Where injury to land is permanent, or is of a character which will not diminish in extent, and which will continue indefinitely, the injury may be regarded as fixed or permanent, and damages therefor may be awarded in one lump sum; but where the injury is not permanent, and in the course of some years will entirely cease, and the extent of the injury may vary from year to year, according to oil escaping and wasted in the process of drilling and transportation, and being brought in a stream down to plaintiff's land, and the amount of damage to plaintiff may be affected by restriction of his available range for stock through settlement, court may properly refrain from awarding one fixed sum as the entire damage, and may award damages in the nature of annual rental, subject to modification as circumstances require.

Appeal from the District Court of the United States for the District of Wyoming; T. Blake Kennedy, Judge.

Action by the Sussex Land & Live Stock Company against the Midwest Refining Company. From the decree (276 Fed. 932), plaintiff appeals, and defendant files cross-appeal. Affirmed.

⬬For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

George L. Nye, of Denver, Colo. (John H. Fry, of Denver, Colo., on the brief), for Sussex Land & Live Stock Company.

Frederick D. Anderson, of Denver, Colo., and A. C. Campbell, of Cheyenne, Wyo. (John D. Clark, of Cheyenne, Wyo., and Kent S. Whitford, of Denver, Colo., on the brief), for Midwest Refining Co.

Before STONE and LEWIS, Circuit Judges, and VAN VALKENBURGH, District Judge.

STONE, Circuit Judge. The action was commenced by Sussex Land & Live Stock Company, a corporation, owning and operating a fully equipped stock ranch of 4,300 acres on Powder river at the mouth of Salt creek and extending up the course of that creek a distance of seven or eight miles, by the filing of its complaint against Midwest Refining Company, a corporation, which is engaged in drilling and operating oil wells, in the Salt Creek oil fields, and in storing, handling and transporting the oil produced in that field.

In the complaint it is alleged: That Salt creek is a small stream compared with the territory it drains; that where Salt creek passes through plaintiff's lands, the creek bottoms are from one-quarter to five-eighths of a mile wide; that willows and brush to a considerable extent grow along the immediate banks of the creek channel; that Salt creek is not a continuously flowing stream, but when not flowing there are in the bed of the stream continuous pools of water fed by seepage and small springs; that several times each year Salt creek overflows its banks and then recedes leaving the pools described; that before defendant commenced its operations, the overflow of Salt creek caused the bottom lands to produce a healthy growth of native bluestemmed grass which could be used for pasturing stock and for hay; that before defendant commenced permitting oil to escape and waste, plaintiff used the pools for stock-watering purposes and that, but for defendant's acts, it would have used its lands in feeding, watering and caring for additional cattle and sheep; that Salt Creek oil fields drain naturally into Salt creek; that defendant for more than four years prior to the commencement of the action continuously permitted large quantities of oil to escape from its wells, pipe lines and tanks and to accumulate in pools from whence it was washed by melting snows and rains into Salt creek and down through and upon the lands of plaintiff; that the escaping oil accumulated in depressions on plaintiff's lands and in large quantities upon the banks, willows and brush along the creek, where in cold weather it congealed and in warm weather melted and ran down into the pools, covering the water with oil and rendering it unfit for stock-watering or any other purpose, and that defendant's acts have deprived plaintiff of its use of its lands in connection with its stock-raising business for a period of more than four years next prior to the commencement of the action.

The substance of the answer is as follows: That little oil enters Salt creek; that plaintiff is not substantially damaged by such part of that oil as reaches its lands; that it had suffered no damage therefrom; that, of the oil which does reach Salt creek, most comes from

natural seepage and the production of companies other than defendant; that defendant, desiring to prevent all loss of oil, maintains an expensive field force and takes every known precaution to prevent any loss; that the loss from it comes from unavoidable causes, such as breaks in pipe lines or when bringing in wells with such high gas pressure that they cannot be at once controlled; that to enjoin all loss of oil which might get into Salt creek would be equivalent to enjoining operation by defendant; that this would result in stoppage of an industry employing thousands of men in Wyoming, paying huge royalties to the United States and to the state and of great importance.

A trial was had and findings of fact and conclusions of law stated. The substance of these findings and conclusions is that defendant has used and is using every known method and device to prevent loss of oil but that such loss does occur to the damage of plaintiff·in the use of its Salt creek lands (both to these lands themselves and in connection with other lands); that such injury to the lands is not·permanent but has occurred for five years and probably will continue during the life of the oil field; that a large industry is dependent upon continuance of defendant's operations; that injunction should not issue but damages should be awarded; that because the plaintiff's evidence has not brought it within the rule allowing damages for loss of prospective profits the court will apply any rule of damages authorized by the evidence; that the evidence is sufficient to apply the rule of rental value; that the annual rental is fixed at forty cents per acre for all the Salt creek land of plaintiff, a total of $720. The decree awarded the above damages for past injury and fixed such as the annual charge during continuation of the trespass; denied the injunction on condition that such damages for past injuries be paid into court within a fixed time; and retained jurisdiction for the purpose of controlling payments for future trespasses.

Plaintiff appealed because the court refused the injunction and applied the "rental value" as the measure of damages. Defendant cross-appealed because any legal liability was found as to it, contending any injury suffered was damnum absque injuria.

[1] Defendant attacks the jurisdiction of this court, claiming that there is no statement of evidence properly here because not allowed in time. This is based on the theory that statements of evidence in equity cases must follow the rule as to bills of exceptions in law cases in that they must be allowed within the judgment term or some extension during that term. This contention is not well founded. Struett v. Hill (C. C. A. 9th Circuit) 269 Fed. 247; In re General Equity Rule 75 (6th Circuit) 222 Fed. 884, 138 C. C. A. 574.

## Merits.

The fact of injury to plaintiff by defendant is unquestioned in both appeals. The cross-appeal challenges legal liability to respond therefor. The appeal challenges the remedy (damages) exclusively applied by the court and, if that be the proper remedy, the rule by which it was measured.

As the challenge of the cross-appeal goes to the right to any relief, logically, it must be first determined before the kind or measure of remedy can be of importance.

The broad contention of the Refining Company is that this is an instance of damnum absque injuria. The facts material to the consideration of this contention are undisputed here. They are as follows: That plaintiff had priority of ownership, occupation and use; the character of usage both by plaintiff and by defendant; no lack of care in defendant; use by it of latest and most approved methods to prevent injury to others; injury by defendant, through its usage, to plaintiff in its usage; the past and continuing character of such usage; the inability of defendant, with the utmost care, to avoid injuring plaintiff's use of its property so long as defendant makes this use of its property. Obviously this state of facts raises squarely the points of whether and under what circumstances one may use his property in a way that injures the property of another without being liable for that injury. That such injury may exist without liability is certain. But, since such a result is contrary to the general rule of liability where injury is caused; and since, in a sense, it is a preference of the rights of one property owner or user over that of another; and since the law is a jealous guardian of the right to lawfully use property without interference or diminution; and since the rule of "sic utere ut alienum non lædas" is of broad and fundamental importance—the rule which allows such injury without liability therefor is an exception which is and should be narrowly limited and carefully confined. However, it does exist. Defendant states the rule as follows:

"In the case at bar there is at most damage without injury. This comes about as the result of the application of a positive principle of property, namely, that the owner of real estate is entitled to the full, ordinary and natural use and enjoyment of his property. * * *

"In conflict with this positive rule of law there is the negative one that the owner of real estate must so use his own property as not to injure his neighbor. It is often difficult to decide which of these principles should control in a given case. Neither one is necessarily preferred. * * *

"The reconcilement of the conflict between the two principles is clear. *The owner of property has the right to use his land according to the lawful inherent natural use to which it is adapted, and if in the enjoyment of such right, without negligence or malice upon his part, consequential loss, inconvenience or damage occurs to his neighbor, it is a wrong for which there is no liability.* This is properly termed the principle or doctrine of 'natural user.' * * *

"The authorities constantly recur to the distinction between natural user and artificial user. * * *

"Artificial uses, whether constituting nuisances per se or otherwise, are certainly radically different from such uses as farming, cattle grazing or mining."

It defines the natural user as:

"The use for which nature fitted his land and intended it should be used."

Defendant then declares mining is such natural user and differentiates it from artificial user as follows:

"In the majority of cases, particularly where mining is involved such a use is the only method of enjoying the land. In the smelter, fertilizer and other like cases, to hold the owner to liability may deprive him of the use of his

land, but he is deprived of the use for which the land inherently is no better fitted than adjoining acreage or land 100 miles away. On the other hand putting this liability on the owner of land unavoidably damaging his neighbor through a natural user may result in preventing oil or coal from reaching the surface and the markets of the world, or result in preventing grass and water from fattening live stock, or preclude the production of useful farming crops. In the latter case the use of the land is taken away; in the other it simply ceases to be a support for buildings and a locality for a manufacturing establishment, and other land equally capable of being such support and constituting such locality may be substituted. The land where the manufacturing plant is established is still suitable for its inherent use and valuable for raising cattle, or giving up mineral, if it is fitted for such uses."

Plaintiff's position is stated in its brief thus:

"The gist of the complaint is that there is a continuing nuisance; that appellant's course of conduct creates a nuisance in two ways: First, because it constitutes a continuing trespass upon appellee's property rights; and, second, because it constitutes a public nuisance which peculiarly and particularly affects and damages the appellee, and in effect appropriates appellee's property to appellant's use and benefit."

And again:

"The rights of appellee are 'the right of a riparian owner as an individual user of water' referred to in Arizona Copper Co. v. Gillespie. 230 U. S. 46, 57, and the right to have and enjoy its property uninvaded 'by superinduced additions of water, earth, sand or other material,' referred to in Pumpelly v. Green Bay Co., 13 Wall. 166, 181."

[2] These are very important contentions which concern fundamental considerations. We may well enter examination of this subject with the observations of the great Chief Justice, made in an historic case (Marbury v. Madison, 1 Cranch, 137, 163, 2 L. Ed. 60) that:

"The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."

We understand that defendant does not contend that plaintiff is without remedy, if its legal rights have been violated. The contention is, rather, that no such rights exist. Defendant claims that the legal right of use of land by an owner is subject to and limited by the right of other property owners to develop the natural resources of their lands in a careful manner. This contention means and is intended to mean that a land owner has a legal right to develop the natural resources of his land without liability for damage caused to other land owners thereby, provided he pursues this development in a manner to cause as little damage as possible. We think it clear either that such statement of the rule is too broad or that the application thereof is limited by certain practical and legal considerations. It has been often stated that where the use of land affects others, the use must be "reasonable" to escape liability for resultant damage to others. What is "reasonable" depends upon a variety of considerations and circumstances. It is an elastic term which is of uncertain value in a

definition. It has been well said that "reasonable," as here used, means with "regard to all the interest affected, his own and his neighbor's and also having in view public policy." 1 C. J. 1203, note 2.

But, elastic as this rule is, both reason and authority have declared certain limitations beyond which it cannot extend. One of these limitations is that it is "unreasonable" and unlawful for one owner to physically invade the land of another owner. There can be no damnum absque injuria where there is such a trespass.

This is well illustrated and settled by many decisions. Among such are cases where substances have been hurled by blasts upon adjoining property while developing quarries. Scott v. Bay, 3 Md. 431; Wilkins v. Slate Co., 96 Me. 385, 52 Atl. 755; Longtin v. Persell, 30 Mont. 306, 313, 76 Pac. 699, 65 L. R. A. 655, 104 Am. St. Rep. 723, 2 Ann. Cas. 198; City of Tiffin v. McCormack, 34 Ohio St. 638, 644, 32 Am. Rep. 408. Also see Cary Bros. & Hannon v. Morrison, 129 Fed. 177, 180, 181, 63 C. C. A. 267, 65 L. R. A. 659; St. Peter v. Denison, 58 N. Y. 416, 421, 423, 17 Am. Rep. 258; Langhorne v. Turman, 141 Ky. 809, 814, 133 S. W. 1008, 34 L. R. A. (N. S.) 211; Sullivan v. Dunham, 161 N. Y. 290, 55 N. E. 923, 47 L. R. A. 715, 76 Am. St. Rep. 274; 1 Thompson on Negligence, § 764; 11 R. C. L. 673. Another large class of such cases is where débris (resulting from natural development of land) has been carried by streams and deposited on other land. Woodruff v. Mining Co. (C. C.) 18 Fed. 753, and cases cited hereinafter concerning pollution of waters.

[3] The facts of the instant case are that oil was carried down by Salt creek from defendant's operations and deposited on plaintiff's grass land to the partial damage of that land in its natural usage. Therefore, as to that portion of the injury arising from such trespass the contention of defendant that the rule of damnum absque injuria applies must be denied.

The other injury complained of and proven by plaintiff is pollution of Salt creek, making it unfit for stock drinking purposes. Section 1, art. 8, of the Wyoming Constitution declares public ownership and control of " * * * all natural streams, springs, lakes or other collections of still water. * * *" Section 3 of the same article, declares that "priority of appropriation for beneficial uses shall give the better right." Section 833, Comp. St. Wyoming 1920, declares:

"Water rights are hereby defined as follows according to use: Preferred uses shall include rights for domestic and transportation purposes. * * * Such domestic and transportation purposes shall include the following: First—Water for drinking purposes for both man and beast. * * *"

Under these constitutional and statutory provisions and the facts of this case, plaintiff had priority of usage of the waters of Salt creek over defendant. A priority of right in water includes—

"the quality as well as the quantity. What deterioration in the quality of the water will constitute an invasion of the rights of the lower appropriator will depend upon the facts and circumstances of each case, with reference to the use to which the water is applied." Arizona Copper Co. v. Gillespie, 230 U. S. 46, 57, 33 Sup. Ct. 1004, 1006 (57 L. Ed. 1384).

Here, the evidence is clear and the court found that the water was rendered partially unfit for stock purposes. Where the rights of

priority are as above shown and the pollution is shown, the authorities are that an actionable wrong has occurred and it is no defense that the cause of the pollution was a natural user of land in a careful manner. The following are mining cases illustrating this rule: Woodruff v. Mining Co. (C. C.) 18 Fed. 753; Logan v. Driscoll, 19 Cal. 623, 626, 81 Am. Dec. 90; Wixon v. Mining Co., 24 Cal. 367, 85 Am. Dec. 69; Levaroni v. Miller, 34 Cal. 231, 91 Am. Dec. 692; Robinson v. Coal Co., 57 Cal. 412, 40 Am. Rep. 118; Hobbs v. Canal Co., 66 Cal. 161, 4 Pac. 1147; Fitzpatrick v. Montgomery, 20 Mont. 181, 50 Pac. 416, 63 Am. St. Rep. 622; Chessman v. Hale, 31 Mont. 577, 79 Pac. 254, 68 L. R. A. 410, 3 Ann. Cas. 1038; C. & H. C. & I. Co. v. Tucker, 48 Ohio St. 41, 26 N. E. 630, 12 L. R. A. 577, 29 Am. St. Rep. 528; Coal Co. v. Ruffner, 117 Tenn. 180, 100 S. W. 116, 9 L. R. A. (N. S.) 923; Arminius Chem. Co. v. Landrum, 113 Va. 7, 73 S. E. 459, 38 L. R. A. (N. S.) 272, Ann. Cas. 1913D, 1075; 18 R. C. L. 1243. An oil case is Niagara Oil Co. v. Ogle, 177 Ind. 292, 98 N. E. 60, 42 L. R. A. (N. S.) 714, Ann. Cas. 1914D. 67. The only case to the contrary is Pennsylvania Coal Co. v. Sanderson, 113 Pa. 126, 6 Atl. 453, 57 Am. Rep. 445, which has been criticized in several cases, among which are Coal Co. v. Ruffner, 117 Tenn. 180, 194, 196, 198, 202, 100 S. W. 116, 9 L. R. A. (N. S.) 923, Arminius Chem. Co. v. Landrum, 113 Va. 7, 14, 73 S. E. 459, 38 L. R. A. (N. S.) 272, Ann. Cas. 1913D, 1075, and Packwood v. Mendota C. & C. Co., 84 Wash. 47, 55, 146 Pac. 163, L. R. A. 1915D, 911.

Our conclusion is that the doctrine of damnum absque injuria cannot apply here and that the violation of plaintiff's rights, both as to trespass and as to pollution of water, should be remedied.

The next matter is to determine the remedy which should be applied. The plaintiff insists that it is entitled to an injunction. The defendant contended below and the court found damages an adequate remedy. In Arizona Copper Co. v. Gillespie, 230 U. S. 46, 56, 33 Sup. Ct. 1004, 1006 (57 L. Ed. 1384), the Supreme Court said:

"Whether upon a bill such as this a court of equity will restrain the acts of the party complained of, or leave the plaintiff to his action at law for damages, must depend upon the nature of the injury alleged, whether it be irremediable in its nature, or whether an action at law will afford an adequate remedy, and upon a variety of circumstances, including the comparative injury by granting or refusing the injunction."

And in Atchison v. Peterson, 20 Wall. 507, 515 (22 L. Ed. 414), it said:

"But whether, upon a petition or bill asserting that his prior rights have been thus invaded, a court of equity will interfere to restrain the acts of the party complained of, will depend upon the character and extent of the injury alleged, whether it be irremediable in its nature, whether an action at law would afford adequate remedy, whether the parties are able to respond for the damages resulting from the injury, and other considerations which ordinarily govern a court of equity in the exercise of its preventive process of injunction."

[4] The injury shown here is not complete destruction of the land for all reasonable natural user. It is not even complete destruction of the user (stock-grazing) particularly affected. The injury is the

partial loss to plaintiff of use to which the land was and is now best adapted and to which plaintiff was putting it. The character of the injury is (as found by the court and as apparent from the evidence) not permanent. When the cause thereof ceases to be active, the effects will, from the nature of the matter and as shown in the evidence, become negligible within a reasonable time thereafter through subsequent floods and the natural decay and disappearance of annual vegetation. The cause may and probably will continue as long as this oil field is actively productive. The life of this oil field is estimated at twenty years. The use which defendant is making of its land is the extraction of the natural resources therefrom and such resources are by far the most valuable, if not the only, value the land has to any one. Should the defendant be deprived for all time of all beneficial use of its land in its natural state because such use necessarily entails partial loss to plaintiff, for a considerable time but not permanently, of the natural user of its land? Each is asserting the same general character of right to the only (or by far most important) natural use to which the respective lands can be put. It would seem that both justice to the parties concerned and public policy would seek some solution of the matter which would permit neither landowner to have the complete use of its land to the entire prevention of use by the other of its land. Why should either suffer extinction? If this use by one destroyed all beneficial use by the other of its land permanently or for any considerable time, another situation would be present. But here one can use its land; the other can partially use its land and can be made whole by damages for the temporary deprivation of complete use thereof. This, in our judgment, is substantial justice between the parties, best serves sound public policy and is within the rule (above quoted) laid down by the Supreme Court in Arizona Copper Co. v. Gillespie and Atchison v. Peterson. Also see Hickey v. McCabe & Bihler, 30 R. I. 346, 356, 75 Atl. 404, 27 L. R. A. (N. S.) 425, 19 Ann. Cas. 783, and Clifton Iron Co. v. Dye, 87 Ala. 468, 6 South. 192.

Nor do we think this view opposed by the cases cited by plaintiff. Those cases are distinguishable as follows:

United States v. Cress, 243 U. S. 316, 325, 326, 37 Sup. Ct. 380, 61 L. Ed. 746, was, for damages only; no question of right to injunction raised; permanent injury and artificial user causing loss.

Pumpelly v. Green Bay Co., 13 Wall. 166, 20 L. Ed. 557, was for damages only, no question of right to injunction raised; permanent injury and practically complete destruction of all value of the property (13 Wall. 177, 181, and comment on this case in United States v. Cress, 243 C. S. 316, at page 328, 37 Sup. Ct. 380, 385, 61 L. Ed. 746).

Arizona Copper Co. v. Gillespie, 230 U. S. 46, 33 Sup. Ct. 1004, 57 L. Ed. 1384, expressly recognized (in the quotation earlier in this opinion) that injunction was not a matter of right and applied that theory by approving the course of the trial court in requiring the dominant owner to take prescribed measures to prevent continuance of the invasion; there was permanent injury therein and the user causing the injury was artificial.

Sandusky Portland Cement Co. v. Dixon Pure Ice Co., 221 Fed. 200, 204, 136 C. C. A. 610, L. R. A. 1915E, 1210 (7th Circuit), was a

case involving direct uses of water but there the use of the land and of the water was an artificial user; the result was complete destruction of the servient owner's rights and was permanent in the sense of continuing indefinitely.

American S. & R. Co. v. Godfrey, 158 Fed. 225, 229, 233, 89 C. C. A. 139, 14 Ann. Cas. 8 (this court), was a case where the dominant user was artificial, the destruction of beneficial user by the servient land well-nigh total and an additional and, apparently, a determining result was the menace to health.

McCleery v. Highland Boy G. M. Co., 140 Fed. 951, 952 (Cir. Ct. Utah), was an artificial user by the dominant owner and a permanent (in the sense of indefinitely continuing) injury and it was upon the latter ground to avoid multiplicity of suits that it was held an injunction might be justifiable.

Indianapolis Water Co. v. Amer. Strawboard Co., 57 Fed. 1000, 1003 (Cir. Ct. Ind.) was a case of artificial user by the dominant owner, permanent (in the sense of indefinitely continuing) injury and injury to public health and comfort.

Woodruff v. North Bloomfield G. M. Co., 18 Fed. 753 (Cir. Ct. Cal.) was a case of total and permanent destruction of beneficial user of the servient land.

Kinnaird v. Standard Oil Co., 89 Ky. 468, 12 S. W. 937, 11 Ky. Law Rep. 692, 7 L. R. A. 451, 25 Am. St. Rep. 545, was for damages with no question relating to the right to an injunction; the dominant user was artificial; the injury was permanent (in the sense of continuing indefinitely) and was an injury to health.

Columbus & Hocking C. & I. Co. v. Tucker, 48 Ohio St. 41, 26 N. E. 630, 12 L. R. A. 577, 29 Am. St. Rep. 528, was for damages only and involved no question as to injunction.

Hauck v. Tide Water Pipe Line Co., 153 Pa. 366, 26 Atl. 644, 20 L. R. A. 642, 34 Am. St. Rep. 710, was for damages only with no reference to injunction; the dominant user was artificial and the injury complete.

Keppel v. Lehigh Coal & Navigation Co., 200 Pa. 649, 652, 50 Atl. 302, was where the injury was permanent (in the sense of continuing indefinitely) and "threatened to become of a permanent nature."

Evans v. Reading Chem. & Fertilizing Co., 160 Pa. 209, 28 Atl. 702, was an artificial user by the defendant and a permanent (in the sense of indefinitely continuing) injury; there was also the feature of injury to health.

Drake v. Lady Ensley C. I. & R. Co., 102 Ala. 501, 14 South. 749, 24 L. R. A. 64, 48 Am. St. Rep. 77, was for damages only; the injury was preventable; part of the injury was permanent.

Day v. Louisville Coal & Coke Co., 60 W. Va. 27, 53 S. E. 776, 10 L. R. A. (N. S.) 167, was for damages only; negligence was present; the dominant user was in part artificial; the injury was permanent.

Town of Bristol v. Palmer, 83 Vt. 54, 74 Atl. 332, 31 L. R. A. (N. S.) 881, was obstruction of a stream by a dam; permanent injury and injury to the public.

Another consideration bearing on this question is the conduct of the parties. It is in evidence that, before the development of de-

fendant's business to its present proportion but while it was clear such development would occur, settlements, by money payments, were made between these parties. While such actions have no bearing upon the right of plaintiff to some remedy and while we do not base our determination heavily upon this consideration, yet it has its weight in this matter of choice of remedies.

Our conclusion is that the trial court was right in denying the injunction and in confining the plaintiff to damages.

[5] The next point is whether the court applied the correct measure of damages. The measure applied was annual rental value. The court felt limited by the lack of evidence as to damage. It adopted the only measure which it thought the evidence would justify and then awarded the largest recovery thereunder that the evidence would permit. Obviously the court was right unless the evidence as to damage justified a greater measure of recovery than rental. The evidence of plaintiff was as follows: That it owns a ranch at the junction of Salt creek and Powder river, comprising approximately 4,300 acres, consisting of two parcels, one parcel lying along Powder river at the mouth of Salt creek, comprising 2,500 acres, and containing 600 acres of irrigated alfalfa land, ranch buildings, corrals, gardens and other acreage, the second parcel joins the first and extends southward up Salt creek, a distance of seven or eight miles, following the course of the stream and giving plaintiff the use of the bottom lands along said creek for said distance and access to and the use of the bed of the stream and pools of water therein for stock watering purposes, and comprising 1,800 acres, including approximately 600 acres of overflow or natural meadows and known generally as the "Salt Creek Pastures," all of which lands and improvements, together with the open range on the public domain, plaintiff uses in its general business of ranching and running herds of cattle and sheep; that the "Salt Creek Pastures" were peculiarly valuable to the entire property because they afforded a naturally protected, well-watered "lambing ground" and fine pasturage for weak cattle; that good lambing ground and good pasturage for weak cattle determined the number of sheep and cattle which could be handled and, in other ways as well, the profitableness of the business; that with the full use of this lambing ground, five thousand more sheep could have been handled than were handled; that with full use of this pasturage for weaklings, 3,000 more cattle could have been handled than were; that the annual average profit from handling these additional sheep would be $12,312.50 and these additional cattle would be $30,000; that, therefore, it was entitled to recover on the basis of an annual loss of $42,312.50.

[6, 7] It is clear that the "Salt Creek Pastures" had a value to plaintiff above and beyond their value when separately used. They had not only their intrinsic value but they enhanced the usefulness, usability and value of plaintiff's other lands for stock purposes. The loss to it was much more than the loss of just the acreage. Plaintiff is entitled to entire compensation for all of this loss to the degree to which it was suffered. It is entirely competent to show the above facts as bearing upon the question of damages. But to adopt these figures as the measure of damages is another matter and one which we think obviously

erroneous. Suppose it should be applied in this case, the result would be that during the four years before and the possible twenty years following the judgment herein, plaintiff would receive $1,057,912.50 for the partial loss of use of this land. Yet the evidence shows that plaintiff never did make the fullest use of its lands during any of the time before or since the oil has materially affected its property. Plainly the number of cattle and sheep actually handled by it from year to year has obeyed considerations other than the capacity of the ranch property and facilities. In passing, it may be noted that the above amount is something more than twice the amount ($21,000) claimed by plaintiff in its petition. This measure would permit recovery for *possible* instead of *probable* profits. Such is not the law. 17 C. J. 785, § 112, and notes thereto. With the above evidence, clearly insufficient as a basis of recovery, there was left only the evidence of rental value upon which to predicate any recovery for damages. This so-called rental value seems to have been estimated with reference to the particular value of these pastures to plaintiff. In this state of the evidence, the court did the only thing possible. Also, if rental value be used as equivalent to the value of the use of these pastures of themselves and also in connection with plaintiff's property and business, the measure was not only a correct measure but the best measure of damages.

What has been said above disposes of this case in so far as denial of the injunction and recovery of past damages are concerned. The court found that future damages would be at the same annual amount, and concluded that this amount should be annually paid into court so long as the "trespass continues in manner and in form as shown by the evidence in this case" or injunction issue on failure so to do. The decree was along this line with the additional provision following:

"That if defendant shall pay into the registry of this court for the use of the plaintiff the said sum of $3,600, and costs as aforesaid, and if the defendant shall hereafter pay into the registry of this court for the use of the plaintiff, said sum of $720 on or before the 4th day of August in each year hereafter, beginning with 1922, so long as said trespass upon defendant's said lands shall continue in manner and form as shown by the evidence in this case, no injunction restraining defendant's acts complained of shall issue herein.

"That if hereafter it shall be made to appear to this court upon petition filed herein supported by affidavits or other proper evidence, and served upon defendant or its counsel of record, that defendant has continued its trespass and has failed in any one yearly period to pay the damage herein fixed as the amount of the whole annual rental value of defendant's said Salt creek lands, then and in that event an injunction may issue herein as the court may then be advised; and for the purpose of considering any such petition and granting any other appropriate and proper relief, this court retains jurisdiction of this cause and the subject-matter thereof."

[8] While vigorously insisting upon the right to an injunction and as vigorously opposing the measure of damages adopted by the court, yet the Sussex Company has not attacked the above method of dealing with the future, if injunction is denied and the trial court's measure of damages is upheld. The Midwest Company declares this course to be proper. It is advisable to advert to it only for the purpose of setting the limits of future action by the trial court. Where the injury is permanent or is of a character which will not diminish in extent and

which will continue indefinitely, it has been possible to regard the injury as fixed or permanent and award damages therefor in one lump sum. Here the injury is not permanent and in the course of some years will entirely cease; the extent of the injury may vary from year to year according to the amount of oil wasted and brought down to plaintiff's land; the amount of damage may be affected by restriction of plaintiff's available range through settlement. These and other uncertain elements properly caused the trial court to refrain from awarding one fixed sum as the entire damage, both past and future. The reasonable certainty that the injury would continue, in some degree for some years to come and the reasonable certainty that such would result in repeated actions for the damages of succeeding periods, prompted the court to make the above disposition of the matter. We see no reason why a reasonable certainty of recurring litigation between the same parties (or those in privity with them) and concerning the same subject-matter may not be the subject of equitable cognizance where the propriety of injunctive relief is raised and remains actively present until the entire situation comes to an end. Here, injunction was sought to control future conduct of the Midwest Company. The court neither granted nor denied an injunction absolutely. The denial was conditional. That condition was prompt payment of future annual damage in the amount found. The court retained jurisdiction fully to control the situation as it might change or develop in the future, by providing "and for the purpose of * * * granting any other appropriate and proper relief, this court retains jurisdiction of this cause and the subject-matter thereof." We construe this language to mean that either party may, at any appropriate time and in an appropriate manner, call attention of the court to such changes in circumstances as would affect the justice of the order as then applied. For examples, the Midwest Company might cease taking all steps then possible to prevent oil entering Salt creek; or the uses of the "Salt Creek Pastures," their relation to the plaintiff's business or their value might so change as to make the above amount determined as annual damage unjust to one or the other party. In the first example, the court could consider evidence and issue an injunction; in the latter, hear evidence and make such alteration in the amount as seemed just. The control of the court over the future situation is such as to enable it to do justice between the parties at all times.

The decree is affirmed.