## SMITH v. STASO MILLING CO.

Circuit Court of Appeals, Second Circuit.
April 4, 1927.

No. 238.

**1. Courts ⊜365(5)—Case concerning enjoyment of land is to be decided in accordance with decisions of highest state court.**

Case concerning enjoyment of land, and depending on relative interests of two landowners, is to be decided in accordance with common law of the state, so far as disclosed by the decisions of its highest court.

**2. Waters and water courses ⊜74—One defiling brook is liable to action by lower riparian owner damaged.**

For one to create near a brook deposits of sludge, which in ordinary course is carried into the brook, is the equivalent of directly defiling it, becomes a wrong, and subjects the wrongdoer to some form of action by a lower riparian owner injured thereby.

**3. Injunction ⊜23—Doctrine of balance of convenience held part of jurisprudence of Vermont.**

The doctrine of balancing the comparative hardships of continued wrong and of injunction *held* to have been so much recognized in the decisions of the highest court of Vermont as to be part of its jurisprudence.

**4. Injunction ⊜23—Doctrine of balance of convenience relative to granting injunction will be followed by federal court, not bound by local law.**

The doctrine of balance of convenience as a determining factor relative to granting injunction is a reasonable one, which federal court will follow, where not bound by local law to follow more rigid rule.

**5. Waters and water courses ⊜75—Pollution of stream by deposits from mill will be enjoined, defendant having been warned and having given assurances before building.**

Pollution of brook by deposits near it of sludge by defendant slate-grinding company, to injury of plaintiff lower riparian owner, will be enjoined, and the peril of any failure successfully to avoid it placed on defendant; it,

before building its mill, having been explicitly warned by plaintiff, and having given explicit assurances that it would avoid defiling the brook.

**6. Nuisance ⊜3(3)—Unavoidable defiling of air by dust from mill will not be enjoined, in absence of warning or promise before building.**

While defiling the air with dust from a slate-grinding mill is a tort, the company, not having been warned, and not having given assurances against it before building, will not be enjoined, if it uses the best arresters and operates them at maximum efficiency.

**7. Nuisance ⊜35—Injunction forbidding jarring of house by blasting at slate-grinding mill held too broad.**

Injunction against slate-grinding mill company forbidding any jarring or shaking of neighboring house by blasting is too broad, and should be modified to forbid blasting at night, when house is occupied, and at all times with such heavy charges as break windows or unreasonably jar the house.

**8. Nuisance ⊜50(2)—Value of country residence, relative to damages, is what it will fetch.**

Value, relative to question of damages, of country residence on which much was spent to suit owner's fancy, is not what it cost, nor what it might bring from a purchaser whom it might chance to please, but what it will fetch.

Appeal from the District Court of the United States for the District of Vermont.

Suit by W. D. Griswold Smith against the Staso Milling Company. From an adverse decree, defendant appeals. Modified and remanded.

Appeal from a decree of the District Court of Vermont enjoining the defendant from polluting with slate dust a brook running through the plaintiff's premises, from similarly polluting the air, and from jarring his dwelling house by blasting, and awarding plaintiff judgment in the sum of ten thousand dollars for past damages.

The plaintiff is the owner of a summer residence in the town of Castleton, Vermont, something less than a mile distant from the defendant's crushing mill. This residence he occupied in substantially unchanged form at the time the defendant bought its land and before it put up its mill. The defendant blasts slate rock upon its premises, which it crushes, and makes from the product ground slate roofing material. The grinding creates clouds of dust, part of which, when the wind is in the right direction, is carried over to the plaintiff's premises, which it covers with pulverized dust. This is one grievance.

In the defendant's process of manufacture there are waste products which it puts upon a dump by a belt conveyor. Through

the conveyor streams of water are run from driven wells, and the thin, muddy or plastic mass flows out into the first of three settling ponds, the overflow from which passes into a second, and so to a third, the three being together designed to retain all the waste. During heavy rains these ponds become filled with water and carry off through the sluices quantities of the sludge or mud, which the defendant has deposited in them. The last of these empties into a brook which runs through the premises of both parties, and on such occasions quantities of the muddy slate reach the plaintiff's land and leave a sediment upon it. He uses the brook for part of his domestic water supply, and the sludge or silt fills his reservoirs and otherwise interferes with his enjoyment of the premises. This is another and more important grievance.

The third is the defendant's heavy blasting in the course of its work, which at times has been violent enough to break the plaintiff's windows, and at others to shake the whole house. This was more serious three years before the trial, when it occurred not only during the day, but at night.

After the defendant had purchased the land, but before it had put up the plant, the plaintiff wrote, calling attention to the brook which flowed through both premises, advising it that its continued purity was a valuable asset to him, and protesting against any pollution or interference with its flow. The defendant's superintendent called upon him, assured him that there was no danger, because the proposed system of filters and settling basins would prevent any such possibility. The assurance was several times repeated. After the erection of the mill the defendant again assured the plaintiff more than once that the trouble had been in the management of the settling ponds.

The defendant has installed dust arresters which are rated to stop 99 per cent. of the dust which is produced. It has invested about $1,000,000 altogether in the plant, employs between 125 and 200 men, and its monthly pay roll is between $25,000 and $40,000.

The plaintiff valued his premises at $40,-000, though it cost in all less than $30,000, but the defendant's witnesses put its value at between $10,000 and $15,000. He had rented part of the land before the trial, and after the defendant's operations were under way, for $150 a season. It is available for a summer residence, and, if a proper tenant could be found, the rental would be much greater.

The District Judge on conflicting evidence found for the plaintiff on all the questions of fact involved, and absolutely enjoined the activities complained of. He fixed the damages from the first operation of the mill in 1917 until February, 1924, at $10,000, for which he allowed judgment. The defendant appealed.

J. B. McCormick, of Granville, N. Y. (M. C. Webber, of Rutland, Vt., of counsel), for appellant.

W. S. Fenton, of Rutland, Vt., for appellee.

Before MANTON, HAND, and SWAN, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1, 2] As this case concerns the enjoyment of land in the state of Vermont, and depends upon the relative interests of two landowners, we are to decide it in accordance with the common law of that state, so far as it is disclosed by the decisions of its highest court. Buchser v. Buchser, 231 U. S. 157, 34 S. Ct. 46, 58 L. Ed. 166. So far as we can find, however, the Vermont decisions are not different, as respects the rights of riparians, from the general law. The defendant, while not using the brook directly, has created in its neighborhood deposits of sludge which were not there in a state of nature. When in ordinary course this is carried into the brook through the settling beds, it is the equivalent of directly defiling the stream itself, becomes a wrong, and subjects the defendant to some form of action, either at law, in equity, or both. Canfield v. Andrew, 54 Vt. 1, 41 Am. Rep. 828; Arizona Copper Co. v. Gillespie, 230 U. S. 46, 33 S. Ct. 1004, 57 L. Ed. 1384; Montana Co. v. Gehring (C. C. A. 9) 75 F. 384; Throop v. Harpers Ferry Paper Co. (C. C. A. 4) 142 F. 690; Strobel v. Kerr Salt Co., 164 N. Y. 303, 58 N. E. 142, 51 L. R. A. 687, 79 Am. St. Rep. 643; Parker v. American Woolen Co., 195 Mass. 591, 81 N. E. 468, 10 L. R. A. (N. S.) 584. That the injury here done is not so trivial that the law will ignore it, is too apparent for discussion.

[3] The defendant, not arguing that the facts justify no relief, insists that no injunction should go, because of the disastrous effect upon his crushing mill, which must stop its operation if enjoined. We are not satisfied that this must be the consequence, but we are content so to assume. The plaintiff argues that those cases in which such considerations have prevailed, do not represent the law of Vermont, which has never balanced the comparative hardships of the continued wrong and the injunction, when the plaintiff's right is substantial and clear.

While we agree that with the possible exception of Ottaquechee Woolen Co. v. Newton, 57 Vt. 451, no decision of that state has actually turned upon the doctrine, it appears to us to have had so much recognition in the decisions of its highest court as to be certainly a part of its jurisprudence, at least until we are authoritatively advised to the contrary. In Canfield v. Andrew, 54 Vt. 1, 41 Am. Rep. 828, while an injunction went, the mandate reserved to the defendant the right to throw sawdust into the stream so far as was absolutely necessary to the operation of its mill. Perhaps this was no more than an apportionment of use between riparian owners, but we are disposed to think not. Certainly the whole discussion in Town of Bristol v. Palmer, 83 Vt. 54, 74 A. 332, 31 L. R. A. (N. S.) 881, would have been irrelevant had the language of Ottaquechee Woolen Co. v. Newton been regarded as obiter. The same is true of Royce v. Carpenter, 80 Vt. 37, 66 A. 888, and Doty v. Village of Johnson, 84 Vt. 15, 77 A. 866, although the recognition was less explicit. The other Vermont cases, on which the plaintiff relies do not seem to us to present the question.

In other jurisdictions the law is in great confusion, and it would serve no purpose here to attempt an exhaustive catalogue of the cases. Arizona Copper Co. v. Gillespie, 230 U. S. 46, 33 S. Ct. 1004, 57 L. Ed. 1384, appears to recognize the doctrine though it did not apply it. In the Eighth and Ninth Circuits, taking the later decisions with the earlier, we believe that the balance of convenience is a determining factor. Mountain Copper Co. v. U. S. (C. C. A. 9) 142 F. 625; Bliss v. Washoe Copper Co. (C. C. A. 9) 186 F. 789; McCarthy v. Bunker Hill, etc., Co. (C. C. A. 9) 164 F. 927; Sussex Land & Live Stock Co. v. Midwest Ref'g Co. (C. C. A.) 294 F. 597, 34 A. L. R. 249. The last case seems to us to qualify, American Smelting & Refining Co. v. Godfrey (C. C. A. 8) 158 F. 225, 14 Ann. Cas. 8. In New York and Pennsylvania probably the rule is otherwise. Strobel v. Kerr Salt Co., 164 N. Y. 303, 58 N. E. 142, 51 L. R. A. 687, 79 Am. St. Rep. 643; Whalen v. Union Bag & Paper Co., 208 N. Y. 1, 101 N. E. 805; Sullivan v. Jones & Laughlin Steel Co., 208 Pa. 540, 57 A. 1065, 66 L. R. A. 712. Massachusetts seems, perhaps a little doubtfully, to be with New York and Pennsylvania. Parker v. American Woolen Co., 195 Mass. 591, 602, 603, 81 N. E. 468, 10 L. R. A. (N. S.) 584.

[4] Assuming that the doctrine is not fixed in the law of Vermont, we think that it is as matter of principle a reasonable one. The very right on which the injured party stands in such cases is a quantitative compromise between two conflicting interests. What may be an entirely tolerable adjustment, when the result is only to award damages for the injury done, may become no better than a means of extortion if the result is absolutely to curtail the defendant's enjoyment of his land. Even though the defendant has no power to condemn, at times it may be proper to require of him no more than to make good the whole injury once and for all. New York City v. Pine, 185 U. S. 93, 22 S. Ct. 592, 46 L. Ed. 820. If the writ went as of course, we should have no option. Notoriously it does not; it goes ex debito justitiæ, and is discretionary if any is. To say that whenever an injured party can show that he could recover damages, he has only in addition to prove that the tort will be repeated, appears to us to ignore the substance of the situation in the interest of an apocryphal consistency. Where we are not bound by the local law, we decline to adopt so rigid a canon.

[5] Nevertheless, so far as concerns the pollution of the stream, we think that the injury is so substantial and the wrong so deliberate, that we ought to impose upon the defendant the peril of any failure successfully to avoid it. The last was a determining consideration in Attorney General v. Algonquin Club, 153 Mass. 447, 27 N. E. 2, 11 L. R. A. 500, a case cited with approval in Bristol v. Palmer, 83 Vt. 54, 74 A. 332, 31 L. R. A. (N. S.) 881. In the case at bar not only did the defendant have the most explicit warning from the plaintiff, but it gave an equally explicit assurance that it could avoid defiling the brook. It has several times repeated that assurance after occasional overflows. If the plaintiff had filed his bill before the mill was built, the balance of convenience would have been different, and we should not have hesitated to stop what as yet remained only a project. Whether the assurances in fact determined his inaction we need not say; he has shown himself pertinacious, though forbearing, and the chances are that they did. Even if not, these preliminary negotiations seem to us enough absolutely to impose upon the defendant the execution of what it promised. As respects the pollution of the stream, we therefore think that the injunction should remain absolute, and that the defendant must find some way to avoid further injury, or make its peace with the plaintiff as best it can.

[6] As regards the dust the facts are different. True, it is equally a tort so to defile

the air. McCarthy v. Natural Carbonic Gas Co., 189 N. Y. 40, 81 N. E. 549, 12 Ann. Cas. 840, 13 L. R. A. (N. S.) 465; Ross v. Butler, 19 N. J. Eq. 294, 97 Am. Dec. 654. But the injury is less oppressive, and neither the plaintiff's original protest, nor the defendant's promise, covered it. We are not prepared in such a situation to say that, if the defendant cannot by the best known methods arrest all the dust which it emits, it must shut down its mill. The record shows that it has installed arresters which are designed to stop all but one per cent. of the dust, and apparently do so. Yet that which escapes is still enough to affect the plaintiff's enjoyment, and the record does not show beyond question that the defendant cannot prevent it. The best disposition of the case is to affirm the injunction as it stands, but to give leave to the defendant to apply at the foot of the decree for relief upon showing there are no better arresters extant, that it operates those it has at maximum efficiency, that it is therefore impossible further to reduce the dust, and that if the injunction continues it has no alternative but to stop operation. If that be proved to the satisfaction of the District Judge the injunction should be modified so as merely to limit the dust to that which will escape the arresters now in use.

[7] The cases are not many which touch upon the injury done by blasting where no trespass is involved by throwing dirt and stones upon the adjoining premises, and we find nothing in the Vermont reports on the subject. The situation is again one where conflicting interests must be compromised. Booth v. R., W. & O. T. R. Co., 140 N. Y. 267, 35 N. E. 592, 24 L. R. A. 105, 37 Am. St. Rep. 552; Brede v. Minn. Crushed Stone Co., 143 Minn. 374, 173 N. W. 805, 6 A. L. R. 1092; King v. American Rock Crusher Co., 119 Kan. 618, 240 P. 394. The decree, as it is, forbids any jarring or shaking of the house; it is too broad. It should be modified to forbid all blasting at night while the house is occupied, and at all times with such heavy charges as break windows, or unreasonably jar the house. Unfortunately the subject-matter does not admit of more definite regulation in advance.

[8] There remains only the question of damages. We cannot accept the estimate of the District Judge as to the value of the plaintiff's premises, which rests only upon his own appraisal, contradicted by the defendant's witnesses, who were surely in a more impartial position. A country residence, on which so much is spent to suit the owner's fancy, cannot be said to have a value equal to its cost. Nor is it fair to take the price which it might bring from a purchaser whom it might chance to please. Its value is what it will fetch, and, while any appraisal is at best scarcely more than a guess, we think that $15,000 is upon this record the most that we can give to it. The damages are even more troublesome to fix than the value. We must take it that the operation of the mill has prevented the plaintiff from leasing his property as a residence, and converted its value into merely agricultural land, but we have no right to say that he would have been able to lease it, had the mill been absent. On the other hand the injury went on for seven years down to the time of the last amendment. It appears to us that an award of five hundred dollars a year is as much as the evidence will warrant. The damages are therefore fixed at thirty-five hundred dollars.

The defendant should bear the costs in both courts. The decree is modified as indicated above, and the cause remanded with instructions to proceed in accordance with the foregoing opinion.